UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------X

EXCELSIOR CAPITAL LLC,

               *Plaintiff*,

             -against-

HERBERT A. ALLEN, TERRY ALLEN
KRAMER, and TERENCE C. McCARTHY,

              *Defendants*.

----------------------------------------------------------X

ECF Case No. 11-cv-7373 (CM) (JLC)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
## <u>DEFENDANTS' JOINT MOTION TO DISMISS THE COMPLAINT</u>

JUDD BURSTEIN, P.C.
1790 Broadway, Suite 1501
New York, New York 10019
Tel: (212) 974-2400
Fax: (212) 974-2944
Email: jburstein@burlaw.com
*Attorneys for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.    Plaintiff States a Claim for Fraudulent Conveyance . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.    Defendants' Mootness Argument Fails . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

C.    This Litigation Was Not Settled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.    The Relevant Parties and Individuals . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

B.    Background of the Underlying Lawsuit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

C.    Robert Allen's Failing Health and the Motive to Defraud . . . . . . . . . . . . . . . . . . . . 6

D.    The Appellate Division Reversal and the
Fraudulent Notarization of a Forged Deed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

E.    The Fraud is Uncovered . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

POINT I

THE STANDARD GOVERNING THIS MOTION . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

POINT II

PLAINTIFF STATES A CLAIM FOR FRAUDULENT CONVEYANCE . . . . . . . . . . . . . . . 13

POINT III

DEFENDANTS FAIL TO DEMONSTRATE THAT . . . . . . . . . . . . . . . . . . . . . . . . . . 16
PLAINTIFF DOES NOT STATE A CLAIM

A.    Defendants Are Properly Named . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

B.    The Claims Are Not Moot . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

C.    Plaintiff is Entitled to Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

D.    Plaintiff is Entitled to an Award of Attorneys' Fees . . . . . . . . . . . . . . . . . . . . . . . . . 21

E.    This Case Was Not Settled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

<u>CASES</u>

*Albert Levine Associates v. Bertoni & Cotti,*
    314 F. Supp. 169 (S.D.N.Y. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16-17

*Arizonans for Official English v. Arizona,*
    520 U.S. 43 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19,20

*Ashcroft v. Iqbal,*
    556 U.S. 662, 129 S.Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Blake v. Blake Agency, Inc.,
    107 A.D.2d 139 (2d Dep't 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Blakeslee v. Rabinor,*
    182 A.D.2d 390 (1st Dep't 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,21

*Camofi Master LDC v. Riptide Worldwide, Inc.,*
    Case No. 10 CIV. 4020 CM, 2011 WL 1197659 (S.D.N.Y. Mar. 25, 2011) . . . . . . . . . 14

*Cook v. Colgate Univ.,*
    992 F.2d 17 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19-20

*FDIC v. Porco,*
    75 N .Y.2d 840 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17-18

*Gaind v. Cordero,*
    Case No. 04 CIV. 9407, 2008 WL 4444124 (S.D.N.Y. Sept. 29, 2008) . . . . . . . . . . . . 15

*In re Am. Preferred Prescription, Inc.,*
    893-84170-478(FGC), 1997 WL 158401 (Bankr E.D.N.Y. Mar. 21, 1997) . . . . . . . . . 21

*In re Kovler,*
    253 B.R. 592 (Bankr. S.D.N.Y. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*James v. Powell,*
    19 N.Y.2d 249 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13,16,20

*Lebard v. De Krassny,*
   280 A.D.2d 371 (1st Dep't 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Magnus v. Fortune Brands, Inc.,*
   41 F.Supp.2d 217 (E.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Marine Midland Bank v. Murkoff,*
   120 A.D.2d 122 (2d Dep't 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Matter of Schwartz,*
   180 A.D.2d 119 (1st Dep't 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*McKevitt v. Mueller,*
   689 F. Supp. 2d 661 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Robinson v. Gucci Am.,*
   Case No. 11-CV-3742, 2012 WL 259409 (S.D.N.Y. Jan. 27, 2012) . . . . . . . . . . . . 12,15

*Sullivan v. Kodsi,*
   373 F.Supp.2d 302 (S.D.N.Y. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Tongkook Am., Inc. v. Shipton Sportswear Co.,*
   14 F.3d 781 (2d Cir.1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*UFCW Local 174 Commercial Health Care Fund v.*
*Homestead Meadows Foods Corp.,*
   Case No. 05 Civ. 7098(DLC), 2005 WL 2875313 (S.D.N.Y. Nov. 1, 2005) . . . . . . . . 17

*Wolde-Meskel v. Vocational Instruction Project Cmty. Services, Inc.,*
   166 F.3d 59 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## STATUTES

Ariz. Rev. Stat. § 44-1004 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Federal Rule 12(b)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

NYDCL § 276-a . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14,22

**INTRODUCTION**

Plaintiff Excelsior Capital LLC ("Plaintiff" or "Excelsior") respectfully submits this Memorandum of Law ("MOL") in opposition to the motion to dismiss the Complaint filed by Defendants Herbert A. Allen, Terry Allen Kramer, and Terence C. McCarthy (collectively, "Defendants"), together with such other and further relief as this Court deems just and proper.

At the outset, we acknowledge that this controversy no longer concerns compensatory damages or equitable relief. The fraudulent transfer at the heart of this case was undone. Nevertheless, as shown herein, Plaintiff still has a right to pursue punitive damages and attorneys' fees so long as its Complaint stated a claim when this case was filed; it did.

**PRELIMINARY STATEMENT**

A.      Plaintiff States a Claim for Fraudulent Conveyance

Defendants' motion papers are replete with irrelevant personal attacks against Plaintiff's counsel, they profess great indignation over Defendants having been sued, and cite to a litany of case law which either has no bearing on our facts, or has been superseded. What Defendants fail to do, is address the substance of Plaintiff's factual allegations. This omission is of course by design. Defendants cannot give credence to the actual facts alleged by Plaintiff, because the fraudulent transfer in this case is so brazen and fundamentally illegal that there can be no legitimate dispute that Plaintiff states a cause of action. Moreover, punitive damages are recoverable based upon our facts, especially when one considers that Defendants committed a felony for which a 7 year sentence is authorized. (*See* NY Penal Law 170.25 and discussion *infra*).

In the face of Defendants' obfuscation, we must reiterate what actually happened here: Defendant Terence C. McCarthy ("McCarthy") notarized the forged signature of C. Robert Allen ("Robert Allen") on a Special Warranty Deed thus transferring his direct interest in Arizona real

property into a limited liability company, a transaction that had the effect of reducing the value of

the asset to creditors, namely, Plaintiff.  Moreover, in notarizing this forged instrument, McCarthy

falsely swore that Robert Allen was present with him in New York County on March 2, 2011, when

in reality, Mr. Allen lay dying in a Nassau County hospital where he passed away one week later.

There is not, and never can be, any rebuttal whatsoever to these core allegations.  Thus, while

Defendants downplay this transaction as "fairly typical estate planning" (*see* Defendants' MOL at

p. 1), both the forgery of Robert Allen's signature and its fraudulent notarization are crimes under

New York law.  *See, e.g., Matter of Schwartz*, 180 A.D.2d 119, 120 (1st Dep't 1992) (criminal

possession of a forged instrument in the second degree is a class D felony); New York Executive

Law § 135-a (fraudulent notarization).

Yet, Defendants Herbert A. Allen ("Herbert Allen") and Terry Allen Kramer ("Kramer") are

indignant over having been joined as Defendants.  They protest too much.  Herbert Allen and Kramer

are proper Defendants in this case for a host of reasons.  While relevant, it is not determinative that

(a) Herbert Allen and Kramer were managers of Allen Ranches LLC, (b) an entity that was

instrumental in devaluing Robert Allen's interest in Arizona real property that they jointly owned,

and thus (c) had a clear financial motive to perpetrate the fraud.  Nor is Herbert Allen a named

Defendant based solely upon his demonstrably false claim to have had no contact with Robert Allen

for 25 years, despite their having (a) shared office space until the date of Robert Allen's death on

March 9, 2011, and (b) negotiated the buyout of Robert Allen's interest in Allen and Co. only 15

years ago.  Similarly, Plaintiff's claims do not rest solely upon the fact that the fraudulent

conveyance was immediately unwound upon Defendants' learning that their fraud had been

discovered – without their even bothering to claim that the transfer had actually been legitimate.

2

While all of these facts and circumstances underscore the validity of Plaintiff's claims, there is one key fact linking both Herbert Allen and Kramer to the fraud that Defendants simply ignore. Specifically, both Herbert Allen and Kramer's signatures on the Special Warranty Deeds that transferred their interests in the Arizona real property to the Allen Ranches LLC were also notarized by McCarthy on March 2, 2011, while Defendants were located in New York County. In other words, the "reasonable inference" to be drawn in Plaintiff's favor is that both Herbert Allen and Kramer were physically present with McCarthy on March 2, 2011, when he notarized the forgery of Robert Allen's signature on the Special Warranty Deed. (*See, e.g., McKevitt v. Mueller*, 689 F. Supp. 2d 661, 665 (S.D.N.Y. 2010) (Koeltl, D.J.)).

Thus, the allegation that Herbert Allen directed McCarthy to participate in the fraud is not based merely upon his being McCarthy's superior at Allen & Co., or because he had a motive to defraud – it is because Herbert Allen was there when it happened. Indeed, it is a legitimate inference that it was either Herbert Allen or Kramer who forged Robert Allen's signature, as McCarthy had no independent motive for doing so, and it would have been too risky to notarize his own forgery. Defendants provide no explanation whatsoever for this highly incriminating set of circumstances. While Plaintiff would not be required to take any such explanation at face value, the failure to even offer one is telling.

B.    Defendants' Mootness Argument Fails

In view of the foregoing, if the fraudulent transfer had not been unwound, Defendants could hardly contend that Plaintiff failed to state a claim. Instead, the real crux of Defendants' argument is that this lawsuit has been mooted. As per Defendants, after they were caught red handed, they

3

were at least good enough to avoid the transfer.  Consequently, the argument goes, Plaintiff has no damages and dismissal is warranted.

The law is to the contrary.  Rather, while Defendants contend that "this case never should have been brought" (Defendants' MOL at p. 2), it was not until **after** Plaintiff filed this action that Robert Allen's direct interest in the Arizona ranch was re-conveyed to his Estate.  This is important from a pleading perspective, because Plaintiff's damages claim relates back to the moment of filing, when the fraudulent transfer was still in effect.  That is not to say that Plaintiff is entitled to a double recovery.  Nevertheless, the question of whether Plaintiff states a viable claim upon which punitive damages can be predicted is determined as of the filing of the Complaint.  At that point in time, as discussed *infra*, Plaintiff's damages were approximately $687,500.

Plaintiff is also entitled to its attorneys' fees in this case, which are substantial based upon its contingency fee agreement with counsel.  Defendants' contention that attorneys' fees are unavailable under the governing law of Arizona is misguided.  While Arizona law controls the question of whether there was a fraudulent conveyance – and here there undoubtedly was – that does not foreclose an award of attorneys' fees under New York law based upon a finding of actual fraud.

C.   This Litigation Was Not Settled

Lastly, Defendants maintain that Plaintiff's counsel entered into a binding settlement of this dispute, despite the absence of a written agreement between the parties, releases, or any consideration whatsoever provided by the Defendants.  In the first instance, the alleged offer to settle was merely a statement of intent; there was no request made for reciprocal performance.  Furthermore, even if counsel's words could be twisted into a settlement offer – and they cannot – the claimed settlement was unsupported by any consideration.  Moreover, the purported settlement

4

offer was not even conveyed to Defendants or their counsel, and Defendants' claim to qualify as third party beneficiaries is unjustified in law or fact.

## STATEMENT OF FACTS

A.     The Relevant Parties and Individuals

Plaintiff is a limited liability company organized under the laws of the State of New York, with Richard Davis as its sole member.  (*See* Exhibit 1 to the January 5, 2012 Declaration of Gary P. Naftalis, Esq. ["Naftalis Dec."], filed in support of this motion, which is the Complaint in this case, at ¶7).[1]  The late Robert Allen was the son of Charles Allen, the founder of Allen & Co., a private banking company whose main office is located in New York County.  Herbert Allen, a cousin of Robert Allen, is the CEO of Allen & Co.  Kramer is Robert Allen's sister.  McCarthy, as Allen & Co.'s Vice President and Co-Chief Operations Officer, reports to its CEO, Herbert Allen. McCarthy is licensed as a Notary (License No. 01MC4767-198) by the State of New York. (Complaint, ¶¶ 8-10).

B.     Background of the Underlying Lawsuit

From the 1990's through 2006, Robert Allen used loans to invest more than $80 million in Superior Broadcasting Company Co. ("Superior"), an entity purportedly engaged in the business of buying, operating and selling radio stations.  (Complaint, ¶12).  In 2004 or 2005, Robert Allen's family began pressuring him to cease lending monies to Superior.  (Complaint, ¶13).

Faced with this pressure from his family, but believing that Superior would ultimately be a successful venture if adequately funded, Robert Allen convinced his neighbor, Richard Davis, to loan money to Superior, as well as to related companies and individuals.  Over a two year period, Davis,

---

[1]        All references herein to the "Complaint" are to Exhibit 1 of the Naftalis Dec.

through his company, Excelsior, loaned almost $40 million.  Superior received $18 million of those monies, $13 million of which was personally guaranteed by Robert Allen. (Complaint, ¶14).  In 2006, Superior defaulted on its obligation to repay the loans that Excelsior had made to it. (*Id.*, ¶15).

On January 9, 2007, Excelsior commenced an action against Robert Allen and Superior in the Supreme Court of the State of New York, styled: *Excelsior Capital LLC v. C. Robert Allen, III*, Index No. 08289/07 (Sup. Ct. Nassau Co.) ("Nassau Litigation").  The Nassau Litigation went to trial in June 2009.  At the close of evidence, the trial court dismissed Excelsior's claims against Robert Allen as guarantor of Excelsior's loans to Superior on the ground that Superior and Excelsior had modified the terms of the loans that Robert Allen had guaranteed without Robert Allen's knowledge. (Complaint, ¶16).  Nevertheless, Excelsior won a jury verdict against Superior on the notes that had been guaranteed by Robert Allen.  (*See* Exhibit C to the accompanying February 10, 2012, Declaration of Judd Burstein, Esq. ["Burstein Dec."], which is the Verdict Sheet from the Nassau Litigation).[2]  Thus, if Excelsior could prevail against Robert Allen on the guarantees, Superior's liability on the underlying debt had already been established.

Following the trial court's dismissal of its claims against Robert Allen, Excelsior appealed to the New York State Supreme Court, Appellate Division, Second Department.  As of late February 2011, a decision on the appeal was imminent.  (Complaint, ¶17).

C.    Robert Allen's Failing Health and the Motive to Defraud

In the last few years of his life, Robert Allen suffered from a number of serious illnesses.  On February 25, 2011, with his health failing rapidly, Robert Allen entered St. Francis Hospital in

---

[2]    Unless otherwise indicated, all Exhibits referenced herein are annexed to the Burstein Dec.

Flower Hill, Nassau County, New York, where he remained until his death on March 9, 2011. (Complaint, ¶18).

As of February 25, 2011, Robert Allen, Herbert Allen, Kramer and other members of the Allen family jointly and directly owned a large parcel of ranch land in Maricopa County, Arizona ("Maricopa Ranch"). At that time, Robert Allen's share equaled 18.334% of the property's value. (Complaint, ¶19). Defendants have admitted that the total value of the property exceeds $15 million, and that Robert Allen's interest in the Maricopa Ranch, when not subject to a lack of marketability discount, is $2.75 million. (Defendants' MOL, p. 3).

At this point in time, Herbert Allen and Kramer were faced with the following circumstances, (a) Robert Allen had entered the hospital and was about to die, (b) there was the possibility of an appellate reversal of the directed verdict and retrial of the claims against Robert Allen, and (c) Superior's liability on the underlying $13 million debt that Robert Allen had guaranteed (exclusive of interest) had already been upheld in the Nassau Litigation. Based upon the foregoing, Defendants Herbert Allen and Kramer, aided by McCarthy, entered into a conspiracy to hinder, delay and defraud Excelsior, as a prospective creditor of Robert Allen and/or his Estate, by creating a limited liability company, Allen Ranches, LLC ("Allen Ranches"), into which all of the Allen Family's ownership interests in the Maricopa Ranch, including Robert Allen's 18.334% ownership interest, were to be transferred in return for, *inter alia*, minority interests in Allen Ranches. (Complaint, ¶20).

Thus, Allen Ranches was formed on February 25, 2011, the same day that Robert Allen was admitted to the hospital where he died shortly thereafter. On information and belief, the source of which is the fact that Allen Ranches was created the very day that Robert Allen entered the hospital (less than two weeks before his death), Herbert Allen and Kramer raced to form Allen Ranches

because they knew that, upon the death of Robert Allen, the opportunity to accomplish a quick transfer of the Maricopa Ranch to Allen Ranches would be lost due to the legal delays inherent in probating a will.  (Complaint, ¶21).

The primary goal of this transaction was to ensure that if Excelsior were to win a judgment against Robert Allen or his Estate, the Allen family would be able to avoid a forced judicial sale of the Maricopa Ranch and instead pay Excelsior a discounted price for Robert Allen's ownership interest in Allen Ranches.  (Complaint, ¶22).  More specifically, as known by Herbert Allen and Kramer, who are very sophisticated in business matters, if judgment were to be entered at a time when Robert Allen or his Estate had a direct ownership interest in the Maricopa Ranch, Excelsior would be able to force a partition and sale of the property, thereby securing full market value for Robert Allen's 18.334% interest.  However, if the Maricopa Ranch were to be owned by an LLC in which Robert Allen or his Estate held an 18.334% interest, Excelsior would no longer have the right to force the sale of the land.  The most that it could reasonably hope to achieve would be a buy-out by the Allen family for far less than the value of a direct ownership interest in the land due to traditional discounts for lack of control and marketability.  (*Id.*, ¶23).

Based upon Defendants' admission that Robert Allen's direct interest in the Maricopa Ranch is worth approximately $2.75 million, the lack of marketability discount reduced the value of that interest by some 25%,[3] or $687,500.

_____

[3]     *See, e.g., Blake v. Blake Agency, Inc.*, 107 A.D.2d 139, 149 (2d Dep't 1985) ("However, a discount recognizing the lack of marketability of the shares of Blake Agency, Inc. [a family owned insurance brokerage firm] is appropriate, and, under the circumstances of this case, the amount of the discount should be 25%. A discount for lack of marketability is properly factored into the equation because the shares of a closely held corporation cannot be readily sold on a public market.").

8

D.     The Appellate Division Reversal and the Fraudulent Notarization of a Forged Deed

On March 1, 2011, the New York State Supreme Court, Appellate Division, Second Department, reversed the dismissal of Excelsior's claims against Robert Allen as guarantor, and directed a retrial of those claims. This ruling now made the transfer of Robert Allen's ownership interest in the Maricopa Ranch to Allen Ranches all the more urgent because Robert Allen was on the verge of death. (Complaint, ¶24).

On March 2, 2011, only one day after the appellate reversal in the Nassau Litigation and just one week before Robert Allen died, Herbert Allen and Kramer executed deeds pursuant to which they transferred their direct ownership interests in the Maricopa Ranch (14% and 18.334% respectively) to Allen Ranches. Herbert Allen's and Kramer's signatures were notarized by McCarthy at the offices of Allen & Co. at 711 Fifth Avenue, New York, New York. (Complaint, ¶25 and Exhibits C and D thereto).

Also on March 2, 2011, and similarly in Allen & Co.'s offices, Herbert Allen or Kramer forged Robert Allen's signature on a Special Warranty Deed transferring his 18.334% interest in the Maricopa Ranch to Allen Ranches in return for "five dollars and other valuable consideration." In their presence, McCarthy then fraudulently notarized Robert Allen's forged signature on the Deed. (Complaint, ¶26, and Exhibits C, D, and E thereto). Shortly thereafter, the other Allen Family members who had ownership interests in the Maricopa Ranch executed documents transferring their direct interest to Allen Ranches. (*Id*., at ¶25).

E.     The Fraud is Uncovered

Robert Allen died on March 9, 2011, and his Estate was thereafter substituted as the Defendant in the Nassau Litigation. (Complaint, ¶27). On September 21, 2011, a Judgment in the

Nassau Litigation was entered against Robert Allen's Estate in the amount of $25,307,940.33 ("Judgment").  (*Id.*, ¶28).  Thereafter, in the course of seeking to enforce the Judgment in the face of claims by Robert Allen's family that he died without sufficient assets to satisfy the Judgment, Plaintiff uncovered the fraud that is the subject of this lawsuit. (Complaint, ¶29).  On October 15, 2011, Plaintiff's counsel sent an earlier draft of this Complaint to counsel for Robert Allen's Estate, and asked that it be sent on to Defendants herein, offering them an opportunity to settle the case in advance of filing.  (*Id.*, ¶30).

On October 17, 2011, Herbert Allen responded in a letter to Excelsior's counsel that was in part demonstrably false, in part wholly incredible, and in part threatening ("I will ask the Court to seek sanctions against you and your client to the fullest extent within its authority.").  However, the most significant aspect of the letter was the part that was missing: a denial of the forgery and an explanation of how and why McCarthy, a senior Allen & Co. Executive, falsely notarized Robert Allen's signature.  Plainly, no senior Allen & Co. executive would have committed the crime of falsely notarizing a signature (New York Executive Law § 135-a) if he had not been directed to do so by Herbert Allen – especially considering that Herbert Allen was present when the fraudulent notarization occurred.  (Complaint, ¶31 and Exhibits C, D, and E thereto).

Rather, in this letter, Herbert Allen falsely denied knowing about Robert Allen's illness or the Nassau Litigation prior to the forgery of Robert Allen's signature.  But if that were so, one would also have to conclude that it was mere coincidence (a) that Allen Ranches was formed on the day that Robert Allen was hospitalized, and (b) that his signature was forged the very day after the appellate reversal in the Nassau Litigation.  (Complaint, ¶32).

10

Herbert Allen's letter further evidences that his involvement in the Allen Ranches transaction was fraudulent because he supported his protestations of innocence by:

a.     Falsely claiming that he and Robert Allen "had no direct business dealings with each other for more than 25 years." In fact, Allen & Co. recently responded to a subpoena by stating that Robert Allen was not bought out of the family business until 1996 – *i.e.*, only 15 years ago;

b.     Making the facially incredible claim that he could not "recall [he and Robert Allen] seeing or even speaking with each other in over 30 years" even though (i) Robert Allen continuously maintained his own offices at Allen & Co. until the date of death on March 9, 2011 (although in the latter years of his life he was too ill to travel there), (ii) as noted, Robert Allen was bought out of the family business in 1996 – a transaction about which he and Herbert Allen must have spoken, and (iii) it is inconceivable that they did not attend a single family affair together in over 30 years; and

c.     Making the wholly incredible claims that he was "not aware of [Robert Allen's] failing health until I learned of his death, shortly after it had occurred," and that he had no knowledge of the Nassau Litigation as of early 2011. These claims are wholly belied by:

(i)     The fact that, according to records maintained by the State of Arizona Corporation Commission, Kramer formed Allen Ranches with Herbert Allen at the very time that Robert Allen entered the hospital to die. It is inconceivable that Kramer did not tell Herbert Allen of her brother's illness and the lawsuit at that time; and

(ii)     The fact that Kramer and Herbert Allen signed the deed transferring their interests in the Maricopa Ranch to Allen Ranches at the same time and before the same notary, McCarthy. Again, it is inconceivable that Robert Allen's illness and the lawsuit would not have been discussed. (Complaint, ¶33).

11

Herbert Allen's protestations of ignorance are further belied by the common sense conclusion (a) that McCarthy, one of Herbert Allen's senior executives, would never have falsely notarized Robert Allen's forged signature unless Herbert Allen directed him to do so, and (b) Herbert Allen would never have directed McCarthy to commit this crime unless Herbert Allen knew that Robert Allen was unable or unwilling to sign for himself.  (Complaint, ¶33).

## ARGUMENT

## POINT I

## THE STANDARD GOVERNING THIS MOTION

Defendants bear a heavy burden on this motion.  "In order to survive a motion to dismiss pursuant to Federal Rule 12(b)(6), a plaintiff must plead sufficient factual allegations 'to state a claim to relief that is plausible on its face.'"  *Robinson v. Gucci Am.*, Case No. 11-CV-3742, 2012 WL 259409, *3 (S.D.N.Y. Jan. 27, 2012) (Oetken, D.J.) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Robinson*, 2012 WL 259409, at *3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). "Determining whether a claim is plausible is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *In re Dreier LLP*, Case No. 08-15051, 2011 WL 6337493 (Bankr. S.D.N.Y. Dec. 19, 2011) (quoting *Iqbal*, 129 S.Ct. at 1950.  "Once the plausibility-standard threshold is met, the complaint survives even if the identified facts seem improbable or recovery is thought to be remote or unlikely."  *In re Trinsum Group, Inc.,* 08 B 12547 AJG, 2012 WL 174279, at * (Bankr. S.D.N.Y. Jan. 20, 2012) (*citing Twombly*, 550 U.S. at 556, 127 S.Ct. at 1965.).

12

## POINT II

## PLAINTIFF STATES A CLAIM FOR FRAUDULENT CONVEYANCE

Plaintiff states a claim for fraudulent conveyance.  Arizona law governs the question of whether the transfer at issue here constituted a fraudulent conveyance.  *See James v. Powell*, 19 N.Y.2d 249, 256 (1967) ("the validity of a conveyance of a property interest is governed by the law of the place where the property is located.") (citations omitted).  Arizona has adopted the Uniform Fraudulent Transfer Act.  Thus, the criteria for stating a claim for fraudulent conveyance under Arizona law is as follows:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following:
> 1. With actual intent to hinder, delay or defraud any creditor of the debtor.
> 2. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor ....:
>> (b) Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

(*See* Ariz. Rev. Stat. § 44-1004).  Excelsior plainly meets the minimal requirement to be a creditor; namely, that "the creditor's claim arose before or after the transfer was made or the obligation was incurred...."  Plaintiff further satisfies the requirements to state a claim under both subsections 1 and 2, for actual and constructive fraud, respectively.

**First**, Plaintiff credibly alleges actual intent to defraud on the part of Defendants considering that (a) Herbert Allen and Kramer spearheaded the formation of Allen Ranches LLC on the day Robert Allen was admitted to the hospital just prior to his death, (b) Herbert Allen and Kramer were the first two members of the Allen family to transfer their interests to Allen Ranches, LLC, (c) they

13

did so by signing Deeds before McCarthy on March 2, 2011, the very day after the Appellate

Division's reversal and one-week before Robert Allen died, (d) also on March 2, 2011, either Kramer

or Herbert Allen forged Robert Allen's signature on a Deed and then they both stood by while

McCarthy, at Herbert Allen's behest, fraudulently notarized the instrument, (e) Defendants then used

that Deed which they had to know was fraudulent in order to transfer Robert Allen's direct interest

in the underlying real property into the Allen Ranches, LLC, and thus shield it from creditors, in

particular, Excelsior, (f) Robert Allen received inadequate consideration of "five dollars and other

valuable consideration" in exchange for deeding his property into an LLC and thus devaluing it by

some $687,500, (g) Robert Allen and his representatives were plainly unaware of the transfer,

considering that his Estate's attorney immediately demanded the return of the original direct interest

in the Maricopa Ranch upon learning that it had been fraudulently conveyed (*see* discussion *infra*

at POINT III(E)), (h) when their fraud was outed, Defendants unwound the transfer without claiming

that the transaction had been legitimate (*see id.*), and (i) Herbert Allen made multiple, demonstrably

false claims in denying his role in the fraud.

     Based upon these facts as alleged, Plaintiff satisfies the pleading requirements of Rule 9(b).

*See Camofi Master LDC v. Riptide Worldwide, Inc.*, Case No. 10 CIV. 4020 CM, 2011 WL 1197659

at *11-12 (S.D.N.Y. Mar. 25, 2011) (McMahon, D.J.):

> Since a claim under Section 276[4] requires proof of actual intent to defraud, it must
> be pled with specificity as required by Rule 9(b). *Sharp Int'l Corp. v. State St. Bank
> & Trust Co.*, 403 F.3d 43, 56 (2d Cir.2005). However, because of the difficulty of
> proving actual intent, such intent may be inferred from circumstantial evidence,
> known as "badges of fraud." *Id.* (citations omitted); *see also Drenis v. Haligiannis*,
> 452 F.Supp.2d 418, 429 (S.D.N.Y.2006). These "badges of fraud" include; (1) a

---

[4]    While this case refers to the New York Debtor Creditor Law, the result is the same as Section 276 deals with actual fraud, as opposed to constructive fraud.

close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance.

(Holding that fraudulent intent was adequately pled under Rule 9(b)) (Some citations omitted).

Here, we have (a) the close relation between the parties, (b) the inadequacy of consideration, (c) Herbert Allen and Kramer retained control of the property as managers of Allen Ranches, LLC, (d) the timing of the conveyance was highly suspicious as it came the day after the appellate reversal and just prior to Robert Allen's death, and (e) the Estate is now insolvent. Furthermore, the facts alleged give rise to an inexorable inference of actual knowledge on the part of Defendants, considering that they forged and then fraudulently notarized the signature of a dying man on the very Deed that effectuated the transfer. *See Gaind v. Cordero*, Case No. 04 CIV. 9407, 2008 WL 4444124, at *6-7 (S.D.N.Y. Sept. 29, 2008) (Griesa, D.J.) (Finding that Rule 9(b)'s particularity requirements were met in the context of a fraudulent conveyance action in part because, as here, the Defendants "participated in the forgery of transfer documents.").[5]

**Second**, Plaintiff also states a claim for constructive fraud, considering that the transfer was not made for reasonably equivalent value and it was reasonable to assume that Robert Allen would

---

[5]     Defendants argue that Plaintiff has failed to satisfy Rule 9(b) pleading's requirements. Indeed, Herbert Allen dedicates an entire Memorandum of Law to this premise. However, as noted, Defendants fail to acknowledge the devastating inference to be drawn from Herbert Allen and Kramer's having appeared before McCarthy in New York County to notarize their Deeds at the same time and place as the forgery and fraudulent notarization of Robert Allen's Deed. The remainder of Defendants' arguments on this score amount to providing what they view as plausible non-fraudulent explanations for the incriminating facts alleged in the Complaint. But even if Defendants could come forward with an arguably plausible explanation for their fraud – they do not – that would not entitle them to dismissal because Plaintiff's claims are plausible on their face. *See Robinson, supra*, at *3.

15

assume debts beyond his ability to pay as his Estate is insolvent.   Moreover, the pleading requirements for constructive fraud are governed by Rule 8, and not Rule 9(b).   *See Sullivan v. Kodsi*, 373 F.Supp.2d 302, 307 (S.D.N.Y. 2005) (Lynch, D.J.).   However, it is only actual fraud that is relevant here, because now that the direct interest in the Maricopa Ranch has been re-conveyed to the Estate, Plaintiff's recoverable damages are limited to punitive damages and attorneys' fees, both of which require a showing of actual fraud.   (*See* discussion *infra* at POINT III(C) and (D)).

## POINT III

### DEFENDANTS FAIL TO DEMONSTRATE THAT PLAINTIFF DOES NOT STATE A CLAIM

**A.**   **Defendants Are Properly Named**

Defendants argue that they are not subject to aiding and abetting liability or conspiracy under Arizona law.   In doing so, Defendants misread the *James* case.   *James* simply held (a) that "the validity of a conveyance of a property interest is governed by the law of the place where the property is located" (19 N.Y.2d at 256) (citations omitted), and therefore, (b) "the availability of a remedy to a judgment creditor who was been prevented from levying execution by a transfer of land located in that jurisdiction constitutes a matter of policy which is properly determinable by the law of Puerto Rico [where the real property was located]."   (*Id.*, at 258).   *James* never held that liability of a defendant who conspires to fraudulently convey property is also determined under the law where the property is located.   Nor do Defendants cite to any case for such a proposition.

Contrary to Defendants' view, the question of whether Defendants can be held liable in conspiracy is governed by New York law.   Thus, in the context of anti-trust conspiracy, *Albert Levine Associates v. Bertoni & Cotti*, 314 F. Supp. 169, 171 (S.D.N.Y. 1970), held:

A person who has been injured in his business for property by a violation of the antitrust laws may sue for damages. 15 U.S.C. § 15. The liability is in tort, but the conspiracy is not a tort. The injury flowing from the conspiracy is the tort. The claim, therefore, arises where the plaintiff suffered injury to his business.

Here, we have a New York plaintiff with a New York judgment that was frustrated by Defendants' having committed the crimes of forgery and fraudulent notarization in New York, and they further forged the signature of Robert Allen, who lived in New York. Therefore, not only was Plaintiff damaged here, but New York has a far greater interest generally in the Defendants' conspiracy than does Arizona. Accordingly, New York law governs the issue of conspiracy.

Under New York law, Plaintiff states a claim for conspiracy to commit the tort of fraudulent conveyance. *See UFCW Local 174 Commercial Health Care Fund v. Homestead Meadows Foods Corp.*, Case No. 05 Civ. 7098(DLC), 2005 WL 2875313, at *2-3 (S.D.N.Y. Nov. 1, 2005) (Cote, D.J.):

> A claim for conspiracy to commit a tort is recognized in New York "to the extent that the plaintiff well pleads the underlying tort." *Fisher v. Big Squeeze (N.Y.), Inc.*, 349 F.Supp.2d 483, 489 (E.D.N.Y.2004); *see also Southridge*, 223 F.Supp.2d. at 490. The plaintiff in this case has pled a conspiracy to commit fraudulent conveyance, which is a species of tort, as well as the substantive claim of fraudulent conveyance. * * *
>
> ... Martin Weiner argues that the pleading of conspiracy against him is deficient because he is not named as a defendant in the fraudulent conveyance claim. In fact, "New York law permits allegations of civil conspiracy when they serve to enable a plaintiff to connect a defendant with the acts of his co-conspirators where without it he could not be implicated."

(Some citations omitted).

In *UFCW Local 174*, the Court goes on to explain why Defendants' reliance upon *FDIC v. Porco*, 75 N .Y.2d 840 (1990), is misplaced:

17

The decision of the New York Court of Appeals in *FDIC v. Porco*, 75 N.Y.2d 840 (1990), is not to the contrary.  In *Porco* the Court of Appeals held that Section 273-a of the Debtor and Creditor Law did not create "a creditor's cause of action in conspiracy," against defendants who have no control over transferred assets or who have not benefitted from the conveyance.  *Id.* at 842. The plaintiffs have alleged sufficient facts to infer both control and benefit here. In any event, the plaintiff in *Porco* did not plead a claim of civil conspiracy to commit a fraudulent conveyance and the decision did not address the viability of such a claim.

In this case, (a) Defendants controlled the property following its transfer, (b) they benefitted from the transfer, and (c) Plaintiff did plead a claim of civil conspiracy.

Moreover, even if Arizona law governed, what Defendants fail to acknowledge is that they are the actual transferors and not merely coconspirators.  Simply put, Robert Allen never signed the Deed that resulted in the transfer of his interest to Allen Ranches, LLC.  Rather, either Herbert Allen or Kramer did, and McCarthy then proceeded to notarize an instrument that he knew to be forged.  Without that forgery and the fraudulent notarization, there could have been no transfer.

Indeed, that fact was confirmed when the Estate's counsel demanded that Defendants re-convey the direct interest in the Maricopa Ranch.  (*See* discussion *infra* at POINT III(E)).  If the transfer really had been a "fairly typical estate planning formula" enacted with the consent of Robert Allen or his representatives, his Estate's lawyer would not have "demanded that Allen Ranches, LLC convey to the Estate of C. Robert Allen, III an undivided 18.344% interest in the underlying assets of Allen Ranches, LLC." (*See* Exhibit 9 to Fogel Dec., p. 2).  Furthermore, Defendants cannot hide behind the fact that the identity of the forger is peculiarly within their knowledge.  Plaintiff is entitled to ascertain who it was through discovery.

The Complaint does speak of Defendants' conspiring and aiding and abetting the fraudulent transfer, because New York law governs that issue.  Nevertheless, if the Court should conclude

18

otherwise – erroneously, we respectfully contend – the Complaint's factual allegations support a claim that Defendants themselves, as the transferors, fraudulently transferred Robert Allen's direct interest in the Maricopa Ranch to Allen Ranches, LLC. That is all that the law requires.[6]

## B.    The Claims Are Not Moot

As per Defendants, because they transferred the direct interest in the Maricopa Ranch back to the Estate, Plaintiff's claims are moot and the Complaint fails to state a cause of action. However, Defendants do not get a free pass simply because they undid their fraud after being caught red handed. Rather, Defendants' purported change of heart did not occur until after this Complaint was filed. Therefore, the re-conveyance is immaterial with respect to Plaintiff's damages calculation insofar as this case in controversy is concerned.[7] This is important not because Plaintiff seeks a double recovery – it does not – but the Complaint demands a punitive damages award which would be calculated in relation to what Plaintiff's damages were as of its filing.

The two cases Defendants rely upon for their mootness argument are entirely inapposite. (*See* Defendants' MOL at p. 9, citing *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997) and *Cook v. Colgate Univ.*, 992 F.2d 17 (2d Cir. 1993)). Dispositively, it was a material factor in

---

[6]    *See, e.g., Magnus v. Fortune Brands, Inc.*, 41 F.Supp.2d 217, 226 (E.D.N.Y. 1999) ("[A]s a matter of pleading, the presence of the NJPLA does not require the dismissal of claims labeled as brought under the common law unless, on the facts alleged, the plaintiff cannot state a claim under all applicable law including the NJPLA."). Therefore, while we do not believe that an amendment is necessary, if the Court should conclude that the Complaint ought to be amended for purposes of clarity, we respectfully request leave to do so.

[7]    *See Wolde-Meskel v. Vocational Instruction Project Cmty. Services, Inc.*, 166 F.3d 59, 62 (2d Cir. 1999) ("Federal diversity jurisdiction is not lost by post-filing events that change or disturb the state of affairs on which diversity was properly laid at the outset.... 'The amount in controversy is determined at the time the action is commenced.'" (quoting *Tongkook Am., Inc. v. Shipton Sportswear Co.*, 14 F.3d 781, 784 (2d Cir.1994)) (some citations omitted).

19

the Courts' dismissal of the plaintiffs' claims in both *Arizonans* and *Cook* that they had exclusively sought injunctive relief as a remedy, and did not request so much as nominal damages. Therefore, once the facts that had originally given those plaintiffs standing to seek an injunction were no longer in effect, their claims truly became moot due to the absence of a claim for even nominal damages. Here, by way of contrast, the Complaint specifically seeks money damages (both compensatory and punitive). Therefore, unlike *Arizonans* and *Cook*, the unwinding of the fraudulent transfer does not render this controversy moot.

**C.    Plaintiff is Entitled to Punitive Damages**

Defendants take the position that punitive damages are unavailable in a case for fraudulent conveyance. (*See* Defendants' MOL at p. 19, citing *Marine Midland Bank v. Murkoff*, 120 A.D.2d 122, 132 (2d Dep't 1986), for the holding that "'punitive damages are not properly awarded in a fraudulent conveyance action.'").[8] However, since *Marine Midland* was decided, it has become clear that New York law authorizes punitive damages in a case for fraudulent conveyance given an appropriate set of facts. *See Blakeslee v. Rabinor*, 182 A.D.2d 390, 392 (1st Dep't 1992) ("[P]unitive damages may now be awarded in a case of fraudulent conveyance, but only if the defendant's conduct was gross and wanton and involved high moral culpability.")

In this case, Herbert Allen and Kramer took advantage of the fact that their relative was dying in a hospital in order to forge his signature on a Deed and then saw to its fraudulent notarization by

---

[8]    Defendants cite New York law on this issue. We agree with Defendants that New York law governs the question of punitive damages, considering that (a) it was a New York notary's license that was implicated in the fraud, (b) the crime of forgery took place in Manhattan, and (c) the Plaintiff is a New York entity. In fact, *James* specifically held that while the question of whether the conveyance was fraudulent was governed by the law of Puerto Rico, the issue of punitive damages was to be decided under New York law. 19 N.Y.2d at 259-260.

McCarthy so as to transform Robert Allen's direct interest in real property into a minority interest in an LLC, and frustrate the legitimate rights of creditors to receive fair value for that interest. Defendants' conduct was thus gross and wanton and involved high moral culpability – indeed it constituted a felony under New York law. Based upon this showing, a trier of fact could properly award punitive damages. *See In re Kovler*, 253 B.R. 592, 604-05 (Bankr. S.D.N.Y. 2000):

> The punitive damage claim is not based simply upon intentional fraudulent conveyance, but upon all of the other misconduct involved in connection with defendants' fabrication of evidence, perjury during the lawsuit and at trial and subornation of false or improper notarizations by both notaries public. Under the facts established in this case I find that the defendants' conduct was of such culpability as to fully meet the standard for punitive damages expressed in *Blakeslee v. Rabinor*, 182 A.D.2d at 392, 582 N.Y.S.2d 132.

(Some citations omitted). *See also In re Am. Preferred Prescription, Inc.*, 893-84170-478(FGC), 1997 WL 158401, *1 and *30 (Bankr E.D.N.Y. Mar. 21, 1997):

> Based upon the facts of this case and the law regarding fraudulent conveyances ... Plan's assets were fraudulently transferred, in bad faith, without consideration to Debtor and/or that Debtor is Plan's alter ego. Therefore, Debtor is liable to Plaintiff to satisfy Plaintiff's judgment against Plan, together with costs and attorneys' fees and punitive damages in an amount to be three times the amount of compensatory damages and not to exceed 25% of the claimed $47 million worth of Debtor. Punitive damages are assessed because of the actual fraud that was demonstrated here.

Defendants only other argument regarding punitive damages is that it is not an independent claim, but must attach to a substantive cause of action. However, as shown above in POINT II, Plaintiff does state a claim for fraudulent conveyance and Defendants cannot establish otherwise.

**D.    Plaintiff is Entitled to an Award of Attorneys' Fees**

The question of whether Plaintiff is entitled to attorneys' fees is decided under New York law:

This Court must apply the choice-of-law rules of New York to determine if the Delaware rule for attorneys' fees applies. *See Manheim Auto. Fin. Servs., Inc.*, 2010 WL 1692954, at *6.

"New York courts classify legal rules as 'substantive' when they relate closely to an underlying right and 'procedural' when they deal with the remedy by which that right is enforced." *Id.* (citing *RLS Assoc.*, 464 F.Supp.2d at 217-18 [citation omitted]). The Delaware attorneys' fee rule tailors the remedy in a breach of contract action, not the right itself. *See Bensen v. American Ultramar Ltd.*, 92-CV-4220, 1997 WL 317343, at * 15 (S.D.N .Y. June 12, 1997) (describing the American rule on attorneys' fees as "a fundamental component of the state's procedural law").* * * "Accordingly, New York law governs the procedural issue of attorneys' fees and costs in this breach of contract action" *Manheim Auto. Fin. Servs., Inc.*, 2010 WL 1692954, at *6.

*Benson v. Quicknowledge, Inc.*, 508-CV-1215, 2010 WL 1930970, at * 3 (N.D.N.Y. May 10, 2010).[9]

Unlike Arizona Law, New York's Creditor and Debtor law provides that attorneys' fees are to be awarded in a case of actual fraud. (*See* NYDCL § 276-a). Under *Benson* and *Manheim*, because the attorneys' fees question is procedural, not substantive, it is governed by New York law. Therefore, considering that (a) the issue of attorneys' fees is controlled by New York law, and (b) Plaintiff states a claim for actual as opposed to constructive fraud, Plaintiff is entitled to attorneys' fees in this case under NYDCL 276-a.

## E.   This Case Was Not Settled

Defendants' position that Plaintiff entered into a binding settlement contract agreeing to dismiss this case is unsupported. Defendants' argument is based upon an email exchange between Plaintiff's counsel and counsel for the Estate, *i.e.*, not even Defendants' attorneys. By way of

---

[9]     *See also Manheim Automotive Fin. Services, Inc. v. Fleet Funding Corp.*, 09CV4357, 2010 WL 1692954, at *6 (E.D.N.Y. Mar. 22, 2010) report and recommendation adopted, 09CV4357, 2010 WL 1688565 (E.D.N.Y. Apr. 22, 2010) (same).

background, this case was commenced on October 18, 2011.  (*See* Docket herein).  Later that same

day, counsel for Robert Allen's Estate wrote Plaintiff's counsel an email stating in relevant part:

> As a follow up to our telephone conversation of a short while ago, this is to confirm that Estate of C. Robert Allen, III has today demanded that Allen Ranches, LLC convey to the Estate of C. Robert Allen, III an undivided 18.344% interest in the underlying assets of Allen Ranches, LLC.
>
> This is to further advise you that I have been informed that the Managers of Allen Ranches, LLC have authorized that transfer and have prepared and are executing the necessary documentation to effect such transfer.

(*See* Exhibit 6 to the January 5, 2012 affidavit of James W. Quinn, at p. 2).

As this writing makes clear, no request was made that Plaintiff agree to dismiss this lawsuit

in exchange for the Estate's demand that its property be returned to it, and no such agreement was

ever reached.  (*See* Burstein Dec., *passim*).  To the contrary, the Estate was plainly acting in what

it perceived to be its best interests.

Plaintiff's counsel replied by asking "[w]hen will that be taken care of?"  (*Id.*)  The response

from the Estate's counsel, sent at 5:32 p.m., stated in relevant part: "It's my understanding it's being

taken care of today."  (*Id.*, at p. 1).  A mere five minutes later, at 5:37 p.m., Plaintiff's counsel simply

responded: "Once I have confirmation of the change, I will dismiss the action as I will have no

damages."  (*Id.*)

Notably, there is no mention in this e-mail of a *quid pro quo* that dismissal would be in

exchange for a transfer back into the Estate of an interest in the underlying real property.  Indeed,

there was no reason to do so, considering that the Estate's counsel had already confirmed that the

Estate had previously demanded the return of its property, and that Allen Ranches, LLC was

complying with that demand.  (*Id.*, at p. 2).  Instead, this was merely a statement of intent.

23

Moreover, it was not supported by any consideration, because the Estate's attorney had already demanded the re-conveyance and Herbert Allen and Kramer, as the managers of Allen Ranches, LLC, had previously agreed to undo their fraud.  It is further unclear how McCarthy could even claim to have provided any consideration in this respect, as he is not a manager of Allen Ranches, LLC.

Faced with an obvious lack of consideration regarding the re-conveyance, Defendants hedge their bets and argue that the consideration could instead have been the agreement to provide confirmation of the transfer.  However, Plaintiff's counsel never conditioned his statement of intent upon it being Estate's counsel, let alone Defendants' attorneys, who provided confirmation of the change.  (*Id.*, at p. 1 and Burstein Dec., ¶11).  In fact, evidence of the transfer would be publicly available information that Plaintiff's counsel could secure for himself.

Decidedly, there was no mention of Defendants herein being third party beneficiaries of the alleged agreement to dismiss in exchange for either (a) the re-conveyance of the interest in the underlying real property, or (b) Estate's counsel providing confirmation of the change – whatever Defendants now claim to be the terms of the alleged contract, which is unclear.  (*Id.*, at pp. 1-2). There is simply no basis to conclude that Plaintiff was agreeing to benefit Defendants upon learning that the Estate had already secured a return of its property.  Therefore, New York's strict requirements to qualify as a third party beneficiary are not met here.  *See Lebard v. De Krassny*, 280 A.D.2d 371, 371 (1st Dep't 2001).

Defendants also cite to a letter offering to pay Plaintiff's attorneys' fees in this case.  (*See* Exhibit 12 to the Naftalis Dec.).  On February 1, 2012, Plaintiff's counsel wrote Defendants' attorneys advising that based upon its contingency fee agreement, its attorneys' fees totaled

24

$213,125, and that Plaintiff's attorney was prepared to recommend that Excelsior settle the case in exchange for a payment of such fees.  (*See* Exhibit A).  On February 4, 2012, Defendants' counsel rejected that proposal outright, effectively withdrawing its offer to pay Plaintiff's attorneys' fees. (*See* Exhibit B).

## **CONCLUSION**

WHEREFORE, for the foregoing reasons, as well as those set forth in the Burstein Dec., and upon all prior proceedings heretofore had herein, Plaintiff respectfully requests that this Court issue an Order: (a) denying Defendants' motion to dismiss in full; together with (b) such other and further relief as this Court deems just and proper.

Dated: New York, New York
        February 10, 2012

<div style="margin-left: 50%;">

Respectfully submitted,
JUDD BURSTEIN, P.C.
*Attorneys for Plaintiff*

By: _Judd Burstein_ PBS

Judd Burstein
Peter B. Schalk
1790 Broadway, Suite 1501
New York, New York 10019
Tel 212-974-2400
Fax 212-974-2944
Email: jburstein@burlaw.com

</div>